UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
UNITED STATES OF AMERICA

                    **MEMORANDUM & ORDER**

    -against-

                    13 CR 220 (RJD)
                    16 CV 6434 (RJD)

KRISTEN HENRY,
                Defendant.
-------------------------------------------------------X
DEARIE, District Judge.

       Defendant-Petitioner Kristen Henry ("Petitioner") was indicted in April 2013 on four

charges: Count I, Travel with Intent to Commit Aggravated Sexual Abuse of a Minor Less than

Twelve Years of Age, carries a mandatory minimum sentence of thirty years' incarceration, 18

U.S.C. § 2241(c); Counts II and III, Conspiracy to Sexually Exploit a Child and Attempted

Sexual Exploitation of a Child, carry mandatory sentences of fifteen to thirty years'

imprisonment, 18 U.S.C. §§ 2251(a) & (e); and Count IV, Coercion and Enticement of Minor to

Engage in Illegal Sexual Activity, has a mandatory minimum of 10 years. 18 U.S.C.§ 2422(b).

       On March 19, 2015, pursuant to a written plea agreement that contained a waiver of

appellate and post-conviction remedies, Petitioner pled to Count IV.  During her plea allocution,

she admitted that she aided and abetted her codefendant, Bebars Baslan ("Baslan"), in using a

telephone to persuade the father and uncle of three children under the age of twelve to supply

those children to engage in sexual acts.  On November 5, 2015, the Court sentenced Petitioner to

the statutory minimum 10-year term of imprisonment, plus ten years supervised release.

       Petitioner now moves under 28 U.S.C.§ 2255 to vacate her conviction and sentence.

"[C]onstrued liberally and interpreted to raise the strongest arguments that they suggest,"

Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks

and emphasis omitted), the prolix, *pro se* materials advance the following five claims relating to the representation Petitioner received from her attorney Ying Stafford: (i) Stafford labored under a conflict of interest in that she was preoccupied with being paid; (ii) Stafford pressured Petitioner into pleading guilty (including that Stafford did not tell her that the Court had dismissed the Indictment's most serious charge (Count I) without prejudice shortly before she pled, and she would not have pled if she had known of the dismissal); (iii) Stafford failed to move to dismiss Count IV (the count to which Petitioner ultimately pled) on the grounds of evidentiary insufficiency; (iv) Stafford's motion to suppress Petitioner's statements failed to adequately marshal evidence of alleged government misconduct; and 5) Stafford tardily and otherwise improperly handled Petitioner's objections to the Presentence Report (PSR).[1]

As discussed below, Petitioner fails to establish a basis for the extraordinary relief authorized by Section 2255.

## FACTUAL BACKGROUND

**Petitioner's Post-Arrest Statements**
**And the Suppression Hearing**

The Court assumes the parties' familiarity with the disturbing nature of Petitioner's offense conduct and with the investigation that, aided by a confidential informant (CI), brought that conduct to the attention of law enforcement.[2] Events relevant to Petitioner's Section 2255

---

[1] Petitioner's submissions include her Motion to Vacate, ECF Doc. 243 (21 pages), her Memorandum in Support, ECF Doc. 244 (50 pages), her set of Exhibits in Support, ECF Doc. 245 (45 pages), and her Reply Memorandum with Appendices and Exhibits, ECF Doc. 258 (totaling 94 pages).

[2] Details of the investigation, offense conduct and overall context can be found in the Court's decision denying Petitioner's motion to dismiss the Section 2422(b) count, United States v. Henry, 2015 WL 1258173 (E.D.N.Y. Mar. 18, 2015), and the two reported decisions in

claims began on March 19, 2013, when Baslan and she were arrested in the hotel room in Jersey City, New Jersey where they were about to bring their criminal plan to fruition. After waiving her Miranda rights, Petitioner made oral statements to FBI agents at the scene and in a vehicle during transport to the Metropolitan Detention Center, and then signed a written statement. A detailed account of these circumstances emerged at the suppression hearing held on February 15, 2015, at which FBI Special Agent John Robertson, who testified, was extensively cross-examined by defense counsel Stafford. T 44-73.[3]

Of note,[4] Robertson testified that after initial statements from Petitioner that he believed were less than truthful, there came a point when he Robertson disclosed to Petitioner "the sting"—*i.e.*, the fact that the "father" who was to supply children for the pornographic photo session was in fact the CI. T 26. In response, petitioner became "animated" (T 27) and, after signing a second Miranda waiver, spoke more candidly about Baslan's and her intentions in going to the hotel: namely, to have her photo taken next to a nude or seminude 7-year-old girl, and possibly with her mouth near the genitalia of an infant boy. T 30. Petitioner admitted that the Benadryl she had just purchased was to be used to keep the girl asleep during the photo shoot. T31. She also spoke of her experience watching child pornography and her preferred film

---

codefendant Baslan's case, United States v. Baslan, 2014 WL 3490682 (E.D.N.Y. Jul 11, 2014) and United States v. Baslan, 2015 WL 1258158 (March 17, 2015).

[3] References are to the transcript of the suppression hearing, Exhibit 1 to the Government's Memorandum in Opposition ("Gov. Mem.").

[4] The testimony of the hearing need only be addressed summarily because it relates to only one (and not the principal) of Petitioner's five §2255 claims (*i.e.*, that her attorney handled the suppression issue deficiently), and because, as will be discussed *infra*, that claim is not even cognizable here.

subjects.

Later, while they were in his vehicle outside the MDC entry bay, Robertson asked Petitioner whether she would make a written statement, she said yes, and he proceeded to write out what she had said to that point. T 35. In drafting the document, however, Robertson purposely made errors "to ensure that [Petitioner] . . . [was] actually reviewing it and not just glossing over it." T 37. Petitioner read the statement, corrected her birth year (T 40), and also made substantive changes to shift culpability from Baslan to the CI. For example, where the statement read, "At [the CI's] and [Baslan's] request I purchased Benadryl to administer to the girl . . .," Petitioner crossed out "At [the CI's] and [Baslan's] request" and wrote, "*I heard [the CI] ask over the phone that* I purchase Benadryl to administer...." T 41 (emphasis added). Where the statement read, "During the visit to the hotel, it was possible that I would be photographed with a nude or seminude 7-year-old girl and . . . simulating sex [with the infant]," Petitioner wrote, at the end of the sentence, "*at the request of [the CI].*" Id. (emphasis added). Petitioner also drew an arrow toward the bottom of the last page and wrote, "The location was determined by [the CI]." Id.

Petitioner did not testify, but in an affidavit in support of the motion she claimed that she repeatedly invoked her right to counsel after her arrest and that the agents ignored these requests and continued to question her. ECF Doc. 171-17.

In denying the motion to suppress, the Court found as follows:

> I have no reason to discredit Mr. Robertson's testimony, nor do I have reason to discredit much of what Ms. Henry says. Flustered, no doubt. Agent Robertson confirms that. Upset to the point of tears? Agent Robertson confirms that. Who wouldn't be? . . . I'm sure she was very upset.

4

The question is: Did she make statements voluntarily and I don't see any indication to the contrary; in fact, every indication I see is that Ms. Henry, whom we now know to be an articulate and intelligent woman, knew what she was doing; knew what she was doing to the point of correcting the statement.

And...once it was disclosed to her that that [the CI] was the setup man she was in full possession of her faculties so much that she began to focus on [the CI] as the responsible party and in an attempt to perhaps ameliorate the situation confronting Mr. Baslan.

Be that as it may, there's no evidence that I can credit here that would suggest that her will was overcome. I'm sure it was not a pleasant occasion for her...

All things considered, I find the testimony of [the agent] credible. I find no evidence to suggest that . . . the statements she gave were in any way involuntary.

There is clear evidence that she's waived her rights not once but twice. The ambiguous request to speak to someone does not, as we know in the law, trigger an obligation to cease the interrogation.

Nevertheless, they did interrupt the interrogation, pause, and re-Mirandized her before the inquiry resumed. So, all in all, I just don't see any basis to the motion which is now denied. (T 76-78).

## Petitioner's Plea and Related Communications

As a result of the many conferences, motions and hearings in Petitioner's criminal case and that of her co-defendant, the Court is deeply familiar with Petitioner and witnessed first-hand most of the circumstances giving rise to the claims she now brings. Additionally, documents furnished in support of the briefing in this §2255 proceeding offer the Court rare behind-the-scenes access to relevant communications that took place outside the Court's presence. These materials include copies of many of the emails exchanged between Stafford and the government prosecutors; some of the emails and letters exchanged between Stafford and Petitioner; a highly

5

detailed declaration from Stafford addressing the relevant circumstances (the "Stafford Declaration"), and a sworn declaration from FBI Special Agent Aaron Spivack summarizing a telephone conversation between Petitioner's mother and the government (the "Spivack Declaration").[5]

The narrative of Petitioner and her plea—including, specifically, the terms of the offer and whether it was open or expired—formally begins with a letter dated October 9, 2014 from the government to Stafford extending to Petitioner the opportunity to plead to Count IV, *i.e.*, the attempted coercion charge which, as noted, carries a ten-year mandatory minimum sentence and was the least severe of the four counts in the Indictment. The letter states that the offer would expire in one month, on November 10, 2014. Nothing in the record documents or even hints at the making of any other offer.

Stafford's Declaration, offering additional background, discloses that this formal offer came in response to a communication from Stafford to the government conveying her client's interest in pleading. Stafford reports that she began discussing with Petitioner the possibility of pleading in late July 2014, after the jury in Baslan's trial returned prompt guilty verdicts on all counts. Stafford Decl. ¶7. "Sometime after that" Stafford advised the government that Petitioner was willing to plead to "misprision of a felony," *i.e.*, concealment. Id.

Nothing in the record documents either the formal extension of the November 10 deadline attached to the October 9 offer or notice that that offer had expired, but a series of subsequent emails indicates that the offer was treated as still open as late as December of that

---

[5] For these reasons, the Court is confident that live testimony "would add little or nothing," Chang v. United States, 250 F.3d 79, 85 (2d Cir. 2001), and so "a full-blown testimonial hearing" is not necessary. Id.

year.  In an email to AUSAs Tyler Smith and Tiana Demas dated December 16, 2014, Stafford writes: "I am working on getting Kristen's plea done as soon as possible [sic] part of that is getting her parents into [sic] see her.  Kristen's mom has asked me to meet with you both when they come to see Kristen.  I said I would pass the message along to you both and ask you to think about it.  When you have had a chance to think about it let me know." Gov. Mem. Exh. 3.  An email from AUSA Demas to Stafford dated December 28, 2014, states: "Please let us know whether Kristen intends to plead this week.  The plea offer will expire, as discussed, at the end of the year." Id.  Stafford replied by email the following day (December 29, 2014), stating, "Thank you.  I know.  I am speaking with Kristen today.  She does intend to plead guilty.  Are you in the office [sic] can I call you in a couple of hours." Id.

On January 7, 2015, however, AUSA Smith told Stafford by email that, "I just wanted to touch base since we haven't heard from you this week.  Can we assume that Ms. Henry is not going to be pleading this week and we're instead going to trial?" Gov. Mem. Exh. 4.  Stafford, replying that same day, wrote, "No I would *not* assume she is *not* going to plead this week.  I am speaking with her tomorrow and [will] let her know for the last time that I am advising her that she take the plea by Friday or I will seek to withdraw from the case." Gov. Mem. Exh. 5 (emphasis added).  In the email Stafford also stated that she would be "advis[ing] the court of the same thing." Id.  She further explained:

> As you know I have not been paid since my initial retainer.  I have been trying desperately to put this deal together and it has taken more time to deal with [this] case than others.  I can't risk my integrity taking her [to] trial even if the judge appoints me.  If you would like to give me another week I think she will come around because this will be a lot for her to process in 24 hours. . . . I want nothing more than for her to plead.  I don't think she will come around with someone else on the case because she will not trust them [sic] but I leave that for you [and AUSA Demas] to discuss. Id.

In her declaration to this Court, Stafford offers some of the particulars of the communications she was having with Petitioner during this time. Stafford states that when she presented Petitioner with the October 9, 2014 written plea offer, Petitioner rejected it "because both she and Mr. Baslan believed that [Petitioner] proceeding to trial would in some way assist in Mr. Baslan's appeal." Stafford Decl. ¶ 8. Stafford alerted Petitioner to the considerations that would lead her (Stafford) to ask the Court to appoint a different attorney to take the case to trial. Finally, Stafford outlined to Petitioner the factors that weighed strongly in favor of accepting the plea, namely, "the fact that it was a very difficult case to win;" that a videotape the government possessed showing Petitioner watching and enjoying child pornography "was devastating;" that Petitioner's intended defense (that Baslan and she were in fact investigating the CI) had been rejected by the jury that convicted Baslan; and that "the potential for spending 30 years in jail was a very real possibility." Id. ¶¶ 8-10.

On January 9, 2015, as forecast in her email to the government, Stafford wrote a letter to the Court asking to be relieved as counsel for Petitioner. ECF Doc. 168. The letter states, inter alia, that "[t]his application comes only after very serious consideration and contemplation on [Stafford's] part, and after thorough discussion of the matter with Ms. Henry." Id. Because Stafford's application and related actions are so central to Petitioner's Section 2255 claims, her thoughtful presentation is quoted here at substantial length.

Stafford wrote, in pertinent part:

> I have made several requests to the government on behalf of Ms. Henry, imploring them for an extension of time to accept their formal plea offer of a 10-year minimum sentence. The government has declined to extend the offer beyond January 9, 2015... Ms. Henry is scheduled to begin trial . . . on April 6, 2015.

As the Court is aware, Ms. Henry has previously expressed her willingness to engage in the plea-taking process, the caveat being her desire for additional time to consult with her family (from which she had been estranged since her incarceration). Ms. Henry has also made an additional request to the Court for an adjournment of her trial date for six months so that she may discuss the options of both pleading and pursuing trial with her family.

I have explained on more than one occasion to Ms. Henry that an adjournment of the trial date never imposes an obligation on the government to extend a plea offer. Indeed, as predicted, upon the expiration of the plea this very day, the government has flatly refused to renew the offer.

Furthermore, with respect to the prospect of trial, both myself and esteemed *Curcio* counsel have advised Ms. Henry that this course of action is unadvisable, and carries the possibility of devastating consequences. A guilty verdict on Count One alone carries with it a statutory mandatory minimum of thirty years imprisonment. In the alternative, accepting the government's plea offer reduces that potential draconian sentence to a ten-year minimum. But that is not all, in taking the plea offer she submits to the requirement of registering as a sex offender upon her release (and the lifelong social stigma it brings) …

The choices she is facing are grim. The punishment parameters set forth in the government's plea offer is a hard pill to swallow…for a young woman with no prior criminal history, nor any purported pre-disposition to commit the nature of crimes alleged in the indictment. This is entirely regrettable given that during the initial phases in the course of these proceedings, the government characterized Ms. Henry as another 'victim' of her former co-defendant.

It is on the basis of our arrival at an impasse, where a plea is no longer on the table and trial is imminent, that I respectfully request to be relieved as counsel.

Id.

Stafford's letter then addresses the financial reality:

> As the Court is aware, I was retained for a nominal fee to represent
> Ms. Henry, which funds were exhausted three months following
> my retention. I have been involved in this case for close to a year,
> working tirelessly on Ms. Henry's behalf. As my client can well
> attest, I have spent untold amounts of hours conferencing with her;
> preparing for the competency hearing; discussing plea options;
> [and] researching and drafting motions.

Id. Accordingly, Stafford asked that the Court appoint successor counsel pursuant to the

Criminal Justice Act ("CJA") to handle the case through trial.

By Order dated January 12, 2015, the Court found the application to withdraw "to be

without basis" and denied it. ECF Doc. 168. The Court also denied the request for an

adjournment of the April 6, 2015 trial date. Id. Stafford then continued to represent Petitioner

and, as the scheduled trial date of April 6 neared, secured the appointment of a funded CJA

attorney to assist her. See ECF Doc. 200 (Memorandum and Order dated March 17, 2015

granting Stafford's ex parte, under seal application for the appointment of a CJA attorney,

paralegal and private investigator nunc pro tunc to March 13, 2015).

Nothing in the record refutes the understanding, apparent from the communications

summarized to this point, that the offer to plead expired in early January. Nevertheless, as the

early April trial date neared, communications between Stafford and the government indicate that

a plea might still be in the works. In a March 10, 2015 email to AUSAs Smith and Demas,[6]

Stafford states, "I would like to discuss any potential plea offer . . . at this point in the case with

you both and your supervisor. I am fully prepared to go to trial, however, I would like to at least

have documented all efforts to exhaust a plea—if at all available." Gov. Mem. Exh. 6. In this

same email Stafford also broached the matter of a damaging videotape in the government's

---

[6] By way of context: Petitioner ultimately pled on Thursday, March 19, 2015.

possession showing the CI, Baslan and Petitioner watching (and enjoying) child pornography, which she wanted Petitioner to view. Id. Stafford reports that during this time, Petitioner and she were preparing for trial, but that the effort to develop a theory of the case was not "productive" because Petitioner "was adamant that the jury would understand and accept her 'investigation of the CI' defense." Stafford Decl. ¶ 11.

The government emailed back the next day (March 11, 2015); the email is silent on the subject of the plea but states that the prosecutors were available to speak with Stafford, and a phone call was scheduled for 2:30 that afternoon. Gov. Mem. Exh. 7. Both Stafford's Declaration and the government's papers are silent on whether that call occurred.

The next communications in the record are emails exchanged a week later, on March 18, 2015. They address scheduling issues involving Petitioner's desire to view the damaging videotape but do not mention the plea.[7] Stafford also received a telephone call from the government that same day, March 18, 2015, advising her that the ten-year plea offer that had expired in January was again available. Stafford told the government that she would not be able to speak to Petitioner about the offer until the following morning at the scheduled viewing of the videotape. Stafford Decl. ¶ 13. That same day Stafford telephoned Petitioner's mother, Cheryl Henry, to tell her about the plea; Stafford reports that Mrs. Henry felt that ten years in jail and sexual offender status was a harsh punishment for her daughter, whom she understandably saw

_____

[7] The production of Petitioner by the U.S. Marshals, for the purpose of viewing the tape, was confirmed for March 19, 2015; Stafford asked to reschedule because Petitioner was to be visited by her parents at the MDC that same day; the government advised that the video could not be viewed without an FBI agent present (because it was child pornography) and agent availability was limited. In the end, it was agreed that Petitioner would view the videotape as scheduled on Thursday March 19, 2015. Stafford Decl. ¶12.

as a victim of codefendant Baslan.[8]

Mrs. Henry, in turn, telephoned AUSA Demas that evening, leaving a voicemail. AUSA Demas and FBI Special Agent Spivack returned the call at approximately 9:00 p.m. Spivack did not take notes but submitted a sworn declaration based on his "general" recollection of the call, and his review of emails on which he was copied that summarized the call. He reports that, during the call, Cheryl Henry "had the mistaken impression" that the government extended to Petitioner "a plea offer to a charge that carried a 5-year mandatory minimum sentence," and that AUSA Demas explained to her that no such offer had been made or would be made. Spivack Decl. ¶¶4-7. During the call, AUSA Demas also explained to Mrs. Henry features of the process that could lessen the total time of Petitioner's incarceration, including credit for time served and the sentence reductions available for good conduct and completion of a residential drug treatment program. Id. ¶ 9. Spivack also recalls that AUSA Demas conceded to Mrs. Henry that she "believed that to some degree Kristen Henry had been victimized by . . . Baslan," but that

---

[8] Although not formally part of the Court's analysis of the legal claims Petitioner advances here, Petitioner's relationship with her codefendant Baslan—fairly described as an "unhealthy dependency," bordering on the abusive, see PSR at ¶¶75-76, 83-84—is part of the broader narrative and what made this an especially difficult and unfortunate case. Stafford's Declaration likewise reveals that Petitioner's relationship with Baslan was a major component of Stafford's strategy. *Inter alia*, it was Baslan's attorney who first brought Stafford into the case; Stafford remarks that when she first met Petitioner, "she appeared to be a woman . . . in an unbearable situation and had little if any trust in anyone" and who "would not trust anyone who expressed any criticism of [Baslan] or their theory of the case." Stafford Decl. ¶3. Stafford discerned that "there could be no discussion regarding a disposition of her case through a plea... for quite some time until [she] was able to gain Ms. Henry's trust." Id. Stafford felt that "the only way to gain Ms. Henry's trust was through" Baslan, and toward that end, she spent hours in meetings with Baslan and Petitioner together. Id. When *Curcio* counsel Susan Kellman later secured a trial severance, Petitioner initially regarded the action as a "betrayal" of Baslan. Id. ¶5.

"Kristen Henry was certainly responsible for her actions." Id. ¶¶10-11.[9]

The next day, March 19, 2015, while in the EDNY proffer room where they would view the damaging videotape, Stafford had two pieces of news for her client: the first was that, the previous night, after conferring with an appellate attorney, she filed a motion to dismiss Count I of the Indictment (with its 30-year mandatory minimum sentence) for lack of venue. The second was that the previously expired ten-year plea offer was back on the table. Stafford Decl. ¶¶15-16. Stafford reports that she made an impassioned plea to her client to accept the deal, emphasizing, inter alia, that going to trial would *not* help Baslan's appeal (as it seemed that Petitioner believed) because, among other reasons, Stafford's trial strategy was to "portray him as a monster who had taken over her life." Id. ¶17.

Stafford and Petitioner then viewed the videotape showing Petitioner watching and enjoying child pornography, an event that Stafford describes as a sea change: Petitioner (according to Stafford) said that it was worse than she had expected, that it "can't" be explained to a jury, and that she no longer wanted to go to trial. Stafford Decl. ¶¶19-20. Further discussions about the government's plea offer ensued—first, between Stafford and Petitioner alone, and then with the government prosecutors, who re-entered the room, and then, after they left, between attorney and client again. Stafford told Petitioner that, if she was ready, the Court was ready to accept her plea that day, but that she could also take the weekend to think about it. Petitioner said she was ready, which Stafford reported to the government. Petitioner's parents

_____

[9] Although Petitioner claims that her mother called the prosecutors "a lot, begging for mercy for her daughter," Petition at 10, there is nothing in the record to support this assertion, or to refute the government's claim that the call summarized here was the only call between prosecutors and Petitioner's mother.

then arrived at the proffer room, and Stafford stepped out to allow them privacy. Id. ¶¶ 21-24.

Outside the courtroom where Petitioner was readying to enter her plea, AUSA Smith advised Stafford that the government consented to the dismissal of Count I, without prejudice, and Stafford went into the holding area and informed Petitioner of the same.[10] Stafford then left her client briefly to prepare for the sentencing proceeding. Id. ¶25.

At approximately 12:30 p.m. that day, March 19, 2015, Petitioner appeared before the Court and entered her plea of guilty to Count IV. See Transcript of Plea Proceedings ("Tr. Plea"), Gov. Mem. Exh. 12. Under oath, in the presence of counsel, Petitioner made a series of important statements in response to the Court's inquiries that are essentially dispositive of the gravamen of her Section 2255 petition. See Tr. Plea at 3-16. On the crucial subject of Stafford's representation, Petitioner replied affirmatively when asked whether she was "satisfied with [her] lawyer" and whether she "wished to have her continue in her role as counsel." Id. at 5. With respect to the plea agreement, the followed colloquy occurred:

> Court:        Ms. Henry, have you read this document?
> Petitioner:   I have.
> Court:        Have you read it carefully?

---

[10] Stafford had not yet seen the government's letter, docketed on ECF earlier that day, in which it consented to Stafford's request to dismiss Count I and joined that request, but "without prejudice, with leave for the government to re-file and Indictment on that charge in another district if it chooses." ECF Doc. 207 (Gov. Ltr dated March 19, 2019). Likewise, Stafford had not yet seen the Court's order granting that application, also docketed that same day (March 19). ECF Doc. 208 ("3/19/15, Count One dismissed without prejudice on gov't's application. So Ordered."

Petitioner, however, claims that she was not told of the dismissal of Count I until after she pled. The Court finds Petitioner's assertions less than credible; in any event, as discussed *infra*, the timing of that disclosure is not material because the dismissal—without prejudice—did not change Petitioner's exposure.

| | |
|---|---|
| Petitioner: | Yes. |
| Court: | Suffice it to say, this is an important document in your life and future right now.  Fair to say? |
| Petitioner: | Yes. |
| Court: | Have you read it with that degree of care? |
| Petitioner: | Yes. |
| Court: | Have you discussed it with counsel? |
| Petitioner: | Yes. |
| Court: | Do you feel that you fully understand everything that's in that agreement? |
| Petitioner: | I do. |
| Court: | Do you have any questions you would like to put to me about the agreement? |
| Petitioner: | No. |
| Court: | Does this plea agreement accurately and fully reflect the agreement or understanding you've arrived at with the assistance of counsel with the [government]? |
| Petitioner: | Yes. |
| Court: | Are there any other promises or understandings that in any way contributed to your offer of a plea that are not reflected in this plea agreement? |
| Petitioner: | No.[11] |

Id. at 8-10.

On the nature of the charge to which she was pleading, and the voluntariness of her plea,

Petitioner replied as follows to the Court's questions:

> Q.     … Do you understand the charge?
>
> A.     Yes.
>
> Q.     And you fully discussed it with counsel?

---

[11] The Court turned to Stafford for confirmation of this detail, which she provided.  Id. at 10.

| | |
|---|---|
| A. | Yes. |
| Q. | Any questions about the charge that you would like to put to me? |
| A. | No. |
| Q. | You're confident you understand the nature of the charge? |
| A. | Yes. |

Tr. Plea at 10-11.

Finally, the Court reviewed, and Petitioner said she understood, the mandatory minimum sentence she faced and the related consequences of her plea, including registration as a sex offender. Id. at 11-16.

Turning to the heart of the matter, as Petitioner entered her plea, she also stated the following:

| | |
|---|---|
| Q. | Are you pleading guilty voluntarily and of your own free will? |
| A. | Yes. |
| Q. | This is the decision you've made with the assistance of counsel? |
| A. | Yes. |
| Q. | And you consider it in your best interest, at this time? |
| A. | Yes. |
| Q. | Has anybody forced you to plead guilty? |
| A. | No. |
| Q. | Has anybody threatened you to plead guilty? |
| A. | No. |
| Q. | Has anybody made you promises we have not addressed or are not included in your plea agreement? |
| A. | No. |

<u>Id.</u> at 16-17.[12]

In accepting Petitioner's plea, the Court announced: "I find the defendant is acting

voluntarily; that she fully understands her rights, the consequences and possible consequences of

her plea; and that there is a factual basis for the plea." <u>Id</u>. at 19.

The following day (March 20, 2015), in an email apparently responding to an email

Stafford sent her the night before, Petitioner wrote:

> From my heart to yours—Thank you, Ying.
>
> I have been thinking a lot about how to convey to you how I feel –
> how grateful I am to you and how much love and respect I have for
> you…and words fall short. Bebars and I call you an angel because
> that's truly what you have been for us when the rest of the world
> hated us. You have held my hand through the most difficult time
> of my life and gave me hope and strength.
>
> I look to you as a pearl…I have not heard of anyone else's lawyer
> doing so much for them. Ying, you have gone above and beyond a
> job—you have been there for me and have impacted so many
> aspects of my life…
>
> I know you put your soul into helping me. I look into your eyes
> and see how much compassion and love you have in you and I am
> so touched and effected. I couldn't agree more that I am thankful
> that our paths have crossed. Like you have said everything
> happens for a reason…
>
> I have asked you before why you do this job – working against this
> dirty machine with such broken people…but Ying, I see why you
> do it. You truly make a difference. You put heart into a
> disheartened system and you touch people…more than you will
> ever know. I absolutely know this. It takes a warrior to do what
> you do and that is what you are. You are a fighter for humanity. . .

---

[12] Petitioner then allocuted as follows: "From on or about and between February 1, 2001 and
March 19, 2013, I aided and abetted one person through the telephone in Brooklyn, New York,
to persuade the father of John Doe 1 and 2 and the uncle of Jane Doe 1 to provide these children
for sexual acts, specifically between the mouth and vulva." <u>Id</u>. at 17.

I am truly relieved with yesterday's decision. I know that it was
the right choice with all things considered. I know that everything
will be ok. One foot in front of the other, one step at a time.

E emailed both of us yesterday relaying the fact that I plead. I
wanted you or to be the one who told Bebars first. ...

Anyway, I hope you feel a weight is lifted. Thank you for
everything. Please enjoy this weekend :)

Love, Kristen.

Stafford Decl. ¶ 26.[13]

**The Post-Plea Period through Sentencing**

Petitioner offers a bevy of emails and letters documenting communications during this

period among herself, Stafford, her mother, the Court, and counsel for codefendant Baslan. See

ECF Doc. 258 (Reply Appendices and Exhibits). In none of these materials, however, does

Petitioner communicate, to anyone, the notion that she regretted having pled, or that she was

coerced into doing so. She of course alleges coercion in her section 2255 papers themselves, but

there is simply no support for her claim that she sought to withdraw her plea before sentencing.

For example, Petitioner writes: "In a second meeting with Stafford in April, Henry expressed that

she definitely wanted to withdraw her plea and go to trial (refer to Appendix B)." ECF Doc. 258

at 33. The referenced "Appendix B," however, is a document Petitioner herself prepared as part

of her Section 2255 submission entitled "Factual Background of Sentencing Phase" containing

her self-authored entry reading "April . . : Henry expresses her desire to withdraw her plea but

Stafford tells her its [sic] too late." This is not a contemporaneous log but one prepared solely

---

[13] Stafford provides the text of the email, not the document itself. Petitioner's reply papers,
which seek to cast the overall attorney-client relationship is a different light, do not dispute this
email's existence or contents.

for this proceeding and so accorded little if any weight.

Sentencing was initially scheduled for September 17, 2015 and adjourned to November 5, 2015. The PSR, issued on June 12, 2015, calculates the advisory Guidelines sentencing range at 262-327 months' imprisonment. It also set forth the details of a mental health evaluation, including a video mentioned in that evaluation that reportedly shows Baslan treating Petitioner in a disturbingly demeaning manner. See PSR ¶ 76.[14]

Emails submitted by Petitioner indicate that she was less than satisfied with Stafford's responsiveness to her concerns with the PSR's contents; the record reflects, however, that Stafford submitted a letter objecting to the PSR's inclusion of the mental health evaluation and to other portions of the document, as well as a plenary sentencing letter with exhibits.

During the sentencing proceeding, Petitioner again made statements under oath, in response to the Court's inquiries, that essentially foreclose the claims advanced in her Section 2255 papers. To wit:

> Q.    Ms. Henry, have you had an adequate opportunity to
>        carefully read your presentence report and the various
>        submissions by the parties?
>
> A.    Yes, Your Honor.
>
> Q.    Have you had an opportunity to confer with counsel in
>        preparation for today's proceedings?

---

[14] Having read a description of what the video depicts, the Court has consistently declined to view it. See Sent. Tr. at 22 (Addressing Petitioner, the Court stated, inter alia, "There's no doubt in my mind that you were in an abusive relationship...I listened to the tapes. I did not watch the videotape. The government offered it to me ... the descriptions alone in the papers by the government and by your own lawyer of what's depicted on the videotape tell the story of extraordinary abuse. The incident in question ... you [were] treated like a piece of common trash by a man who purportedly loves you. . .").

| Q. | A. | I have, Your Honor. |

A.    I have, Your Honor.

Q.    Are you satisfied with counsel's representation?

A.    Yes.

Q.    I'm sorry?

A.    Yes, Your Honor.

Transcript of Sentencing Proceeding, Nov. 5, 2015 ("Sent. Tr."), Gov. Mem. Exh. 14, at 2-3.

Of note, the Court also turned to AUSA Demas to inquire as follows:

Q.    May I ask you a question?

A.    Yes, Your Honor.

Q.    Was there a point in time early in the prosecution where a plea involving a five-year mandatory minimum was available to this woman?

A.    There was not, Your Honor, because she was never charged with an offense that had a five-year mandatory minimum, the lowest charge was always the coercion charge and that's just because of the nature of the offense.  Distribution would have been the type of charge that would have a five-year mandatory minimum but the defendant simply didn't do that.

Id. at 10.

The ensuing arguments by the government and Stafford were impassioned.  Among other things, Stafford argued that, "Ms. Henry pleaded guilty against the wishes of Mr. Baslan, trust me, very much against it, so she accepted responsibility." Id. at 18.   When it was her turn to speak, Petitioner began by expressing remorse to her victims, saying, "my heart goes out to them.  I imagine that the world became a much scarier place for them in 2013 and I sincerely hope that they feel a sense of justice being served today. Id. at 19.  She also thanked Stafford: "To Ying, thank you for being there for me and for caring." Id. at 19-20.

The Court, in expressing its awareness of the role that Baslan played in Petitioner's life, nonetheless reiterated its view that Petitioner "[is] intelligent, that's quite obvious," and told Petitioner that, based on such events as her having edited her post-arrest statement and her

having fired two attorneys, "you can speak up for yourself when you want to, no shrinking violet..." Id. at 21. The Court then imposed the mandatory minimum sentence and ruled that it would not strike anything from the PSR.

## DISCUSSION

### GENERAL § 2255 STANDARDS

Title 28 U.S.C. § 2255 provides, in pertinent part, as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255. Relief is available only for "a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'" LaMarco v. United States, 336 F. Supp. 3d 152, 164 (E.D.N.Y. 2018) (quoting Cuoco v. United States, 208 F.3d 30, 37 (2d Cir. 2000) (internal quotations and citations marks omitted)). Indeed, "to obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal." LaMarco, 336 F. Supp. 3d at 164-165 (internal quotations and citations omitted). A district court's "discretion to grant relief under § 2255 is to be exercised sparingly, for such applications are in tension with society's strong interest in the finality of criminal convictions." Id. (internal quotations and citations omitted). See also Brecht v. Abrahamson, 507 U.S. 619, 633–34 (1993) ("the writ of habeas corpus has historically been regarded as an extraordinary remedy, a bulwark against

convictions that violate fundamental fairness," and "[t]hose few who are ultimately successful [in obtaining habeas relief] are persons whom society has grievously wronged and for whom belated liberation is little enough compensation") (internal quotations and citations omitted).

## ANALYSIS OF PETITIONER'S CLAIMS

### Threshold Issue: The Plea Agreement's Section 2255 Waiver

A threshold question is whether this entire § 2255 proceeding is barred by the relevant waiver in Petitioner's plea agreement, which provides, in pertinent part, that she "agrees not to file an appeal or otherwise challenge, by petition pursuant to 28 U.S.C. § 2255 or any other provision, the conviction or sentence in the event that the Court imposes a term of imprisonment of 327 months or below." Gov. Exh. 4 at ¶ 4. The Court, as noted, imposed a term of 10 years, well below the waiver ceiling of 327 months.

The law on the subject is well-established: "A defendant's knowing and voluntary waiver of the right to appeal or collaterally attack his conviction and/or sentence is enforceable." Sanford v. United States, 841 F.3d 578, 580 (2d Cir. 2016) (*per curiam*) (collecting cases). As the Second Circuit explains, although plea agreements are "construed strictly against the government . . . exceptions to the presumption of the enforceability of a waiver . . . occupy a very circumscribed area of our jurisprudence." Id. (internal citation and quotation omitted). The exception to the presumption of enforceability relevant here is "when the waiver was not made knowingly, voluntarily, and competently." Id. Necessarily, a plea agreement's waiver of the right to seek collateral relief cannot bar a section 2255 challenge to the voluntariness with which that agreement was entered into. See id. The Court therefore proceeds to the merits of

22

Petitioner's claims.[15]

## Ground One: Alleged Conflict of Interest

Petitioner's first claim rests heavily on Stafford's application to withdraw in the face of the apparent expiration of the plea offer and the prospect of continued representation without pay. Petitioner argues that Stafford was in fact preoccupied with getting paid, and with this Court's impression of her. She also avers, among other things, that Stafford "had hoped to get onto the Brooklyn CJA panel," "complained that she was walking on eggshells with Judge Dearie because she was always showing up late to hearings," and "constantly voiced her concern that the Court was not going to appoint her." Pet. Mem. in Support, ECF Doc. 244 at 3. Thus, in Petitioner's view, Stafford was not fully committed to representing her but instead exhibited a conflict between interest in herself and interest in her client, and continued to labor under that conflict after the Court denied her application to withdraw.

This claim fails to establish a basis for Section 2255 relief.

Conflict-of-interests claims are a species of Sixth Amendment jurisprudence. See

---

[15] The corollary inquiry considers *what portion* of a petitioner's Section 2255 claims may be reached under this rationale. The Second Circuit's standard announced in Parisi v. United States, 529 F.3d 134, 138 (2d Cir. 2008), cert. denied, 555 U.S. 1197 (2009), distinguishes between challenges to the plea process, which necessarily survive plea agreement waivers, and challenges relating to "pre-plea events" which ordinarily do not. Id. at 137-38. But as Parisi also recognizes, "[e]verything that occurs prior to a guilty plea or entry into a plea agreement informs the defendant's decision to accept or reject the agreement," id., a statement that can be read as authorizing ineffectiveness claims challenging an attorney's handling of these pre-plea events even when they are well outside the four corners of the plea process. See, e.g., Cross v. Perez, 823 F. Supp. 2d 142, 152 (E.D.N.Y. 2011) (Cogan, J.) ("Parisi's broad 'connectivity' standard, in my view, allows virtually all ineffective assistance claims to survive waivers procured through plea agreements"). The Court need not formally address where the Parisi line might fall in this proceeding because, as discussed *infra*, the Court finds in any event that none of Petitioner's claims establishes a basis for Section 2255 relief.

generally Strickland v. Washington, 466 U.S. 668 (1984); Wood v. Georgia, 450 U.S. 261, 271 (1981) ("Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interests"); United States v. Schwarz, 283 F.3d 76, 90 (2d Cir. 2002) ("A defendant's Sixth Amendment right to effective assistance of counsel includes the right to representation by conflict-free counsel") (internal quotation and citation omitted).[16] Conflict claims differ from traditional Strickland claims in that, where an actual conflict is shown, the prejudice a defendant ordinarily must show under Strickland is presumed. Id., 466 U.S. at 692; Cuyler v. Sullivan, 446 U.S. 335, 349-50 (1980) (same). Thus, "a defendant claiming he was denied his right to conflict-free counsel based on an actual conflict need not establish a reasonable probability that, but for the conflict or a deficiency in counsel's performance caused by the conflict, the outcome of the trial would have been different. Rather, he need only establish (1) an actual conflict of interest that (2) adversely affected his counsel's performance." Schwarz, 283 F.3d at 90.

The Second Circuit has held that "[a]n attorney has an actual, as opposed to a potential, conflict of interest when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action."

_____

[16] Under the familiar Strickland standard, to establish ineffective assistance of counsel a defendant must show that counsel performed deficiently, and that, as a result, the defendant was prejudiced. 466 U.S. at 688. Deficient performance is an act or omission of counsel that "fell below an objective standard of reasonableness." Id. This standard "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." Id. at 687. To establish prejudice, a defendant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

Winkler v. Keane, 7 F.3d 304, 307 (2d Cir. 1993).[17] As a matter of law, the matters about which Petitioner complains (Stafford's interest in getting paid and related application to withdraw) do not rise to the level of an actual conflict of interest. See O'Neil, 118 F.3d at 71 ("[W]e never have held that failure to pay fees or an attorney's motion to withdraw for his client's failure to pay, without more, gives rise to a conflict of interest and decline the invitation to do so here."); Crowder v. Ercole, 2012 WL 5386042 (E.D.N.Y. Nov. 2, 2012) (relying on O'Neil, holds that attorney's response to client's grievance, filed mid-trial in effort to secure substitution of counsel, did not establish conflict); Silva v. Miller, 2009 WL 4060946, at *9 (S.D.N.Y. Nov. 24, 2009) (fee dispute does not establish conflict of interest, citing O'Neil).

Critically, the Court in O'Neil recognized that the question of fees "may cause some divisiveness between attorney and client" but it "presume[s] that counsel will continue to execute his professional and ethical duty to zealously represent his client, notwithstanding the fee dispute," 118 F.3d at 71, and that is precisely what Stafford did, as the facts detailed above plainly show. In seeking to withdraw, Stafford also sought to protect Petitioner's interests by asking the Court to appoint counsel pursuant to the CJA in order that Petitioner would "have the resources necessary for an adequate defense at trial," and when the Court denied the motion to

---

[17] Of the three types of conflicts that receive attention in the jurisprudence—*per se*, actual, and potential—only the "actual" category is sufficiently implicated by Petitioner's claims to require separate treatment here. *Per se* conflicts exist only where the attorney was not licensed to practice or was implicated in the defendant's crime, United States v. O'Neil, 118 F.3d 65, 70-71 (2d Cir. 1997), cert. denied, 522 U.S. 1064 (1998), and "potential" conflicts are essentially indistinguishable from traditional Strickland claims and so analyzed under that standard. Id.; Winkler, 7 F.3d at 307. In other words, "[a] defendant does not establish an actual conflict of interest merely by expressing dissatisfaction with the attorney's performance." Crowder v. Ercole, 2012 WL 5386042, *11 (E.D.N.Y. Nov. 2, 2012) (internal quotation and citation omitted).

withdraw, Stafford continued on, zealously representing Petitioner for nearly a year through the plea and sentence. No further inquiry into the conflict claim is required.[18]

**Ground Two: Coerced Plea**

Petitioner claims that Stafford pressured and intimidated her into pleading guilty. She also claims that Stafford failed to tell her before she entered her plea about the dismissal of Count I (which carried the thirty-year mandatory minimum) and that had she known, she would not have pled.

These assertions do not establish a basis for Section 2255 relief.

The Sixth Amendment right to effective assistance exists at "critical stages of a criminal proceeding," including the entering of a plea and the negotiations and communications that precede it. Lafler v. Cooper, 566 U.S. 156, 165 (2012); Hill v. Lockhart, 474 U.S. 52, 58 (1985). The Supreme Court has recently reaffirmed the rule, first announced decades ago in Hill v. Lockhart, with respect to the nature of prejudice required in this context:

> [w]hen a defendant alleges his counsel's deficient performance led him to accept a guilty plea rather than go to trial, we do not ask whether, had he gone to trial, the result of that trial would have been different than the result of the plea bargain. That is because, while we ordinarily apply a strong presumption of reliability to judicial proceedings, we cannot accord any such presumption to judicial proceedings that never took place. . . We instead consider whether the defendant was prejudiced by the denial of the entire judicial proceeding to which he had a right. As we held in *Hill v. Lockhart*, when a defendant claims that his counsel's deficient

---

[18] If Petitioner *had* established an actual conflict, the Court would inquire into the second element, *i.e.*, whether the actual conflict of interest adversely affected counsel's performance. Matera v. United States, 83 F. Supp. 3d 536, 550 (S.D.N.Y. 2015). Were it necessary to reach that inquiry here, the Court's determination, *infra*, that Petitioner failed to establish deficient performance or prejudice under Strickland on her other ineffectiveness claims would be dispositive.

> performance deprived him of a trial by causing him to accept a plea, the defendant can show prejudice by demonstrating a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.

Lee v. United States, 137 S. Ct. 1958, 1965 (2017) (internal quotation marks, citations and alterations omitted).

Further, the Court in Lee also reaffirmed that "the inquiry [it] prescribed in *Hill* focuses on a defendant's decisionmaking" rather than on the likelihood of acquittal at trial. 137 S. Ct. at 1966. Lee rejected the government's invitation to hold that a defendant with "no viable defense at trial" cannot show prejudice "from accepting a plea where his only hope at trial was that something unexpected and unpredictable might occur that would lead to an acquittal." Id. While recognizing the reality that "a defendant without any viable defense will be highly likely to lose at trial" and that such a defendant "will rarely be able to show prejudice from accepting a guilty plea that offers him a better resolution than would be likely after trial," Lee reaffirms that the critical inquiry, to which the probability of acquittal "may be pertinent," id. at 1967, remains "what [the] individual defendant would have done." Id.

Finally, Lee reaffirms that this particular prejudice inquiry is still a Strickland inquiry, and that "[s]urmounting *Strickland*'s high bar is never an easy task." 137 S. Ct. at 1967 (internal quotation and citation omitted). Lee also cautions that "[t]he strong societal interest in finality has special force with respect to convictions based on guilty pleas," and that "[c]ourts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies." Id. (internal citation and quotation omitted). Instead, Lee instructs that "[j]udges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences." Id.

Even under the Strickland umbrella, of course, the essential inquiry remains "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." Hill, 474 U.S. at 56 (internal quotation and citation omitted). As recently expressed in this Court, "[a] plea is considered 'intelligent if the accused had the advice of counsel and understood the consequences of his plea, even if only in a rudimentary way,' and it is considered 'voluntary if it is not the product of actual or threatened physical harm, mental coercion overbearing the defendant's will, or the defendant's sheer inability to weigh his options rationally." LaMarco, 336 F. Supp. 3d at 166 (internal citations and quotations omitted).

Little discussion is required to dispose of the coerced-plea claim Petitioner now advances, for the record as recounted above speaks for itself. Despite her current change of tune, the statements that Petitioner made under oath at the time she entered her plea and during her sentencing proceeding bind her here. See generally Blackledge v. Allison, 431 U.S. 63, 74 (1977) ("Solemn declarations in open court carry a strong presumption of verity"). Further, as noted, because of the Court's familiarity with Petitioner, the Court had no doubt whatsoever that Petitioner meant these statements at the time she made them, and nothing in her loquacious Section 2255 papers, all *post hoc* statements, disturbs that view one iota. The same presence of mind Petitioner exhibited when she altered Agent Robertson's written statement in the police vehicle outside the MDC entry bay shortly after her arrest is the same presence of mind with which she entered her plea. The other "contemporaneous evidence" for purposes of Lee, 137 S. Ct. at 1967, includes her written expression of gratitude to Stafford the day after she pled, her gratitude at sentencing, her open expression then of remorse to the victims of her crime, and the absence of any expression of plea-regret between the plea and sentencing proceedings. These

28

are, quite simply, not the words and actions of a woman coerced into pleading. To be sure, Stafford encouraged Petitioner to see the wisdom of the deal she was being offered and to avoid the foolhardy course of trial, likely conviction, and a thirty-year mandatory sentence. But encouragement is not coercion—certainly not in this case where, as the Court remarked on more than one occasion, the defendant was intelligent, strong-willed, and regularly spoke up for herself.

Two loose ends require brief comment. First, Petitioner's assertion that she would not have pled if she had known of the government's consent to the dismissal of Count I is a non-starter. The Court credits Stafford's declaration that she told Petitioner of the dismissal before the plea, but in any event the timing of her conveyance of this information is immaterial to Petitioner's coerced plea claim because (i) the dismissal was without prejudice and only on venue grounds so it did not eliminate Petitioner's exposure to the 30-year mandatory minimum sentence; and (ii) assuming arguendo that Petitioner did not know of the dismissal before her plea, she clearly knew later that day, and did not then seek to vacate her plea in the ensuing eight months between the plea and sentencing. Further, as the context shows, the government's consent to the dismissal appears to have been part of the winding down of matters in contemplation of the plea later that day. Plainly, if the plea fell through, the government would have promptly re-indicted Petitioner on that same charge in the District of New Jersey.

The other non-starter is the phantom five-year deal that Petitioner says she would have accepted. The Spivack Affidavit, AUSA Demas's response to the Court's direct inquiry at sentencing, and the absence of anything in the record to suggest such a plea ever existed, fully put the subject to rest.

**Ground Three: Stafford's Alleged Ineffectiveness for
Failing to Move to Dismiss Count IV (to which Petitioner Ultimately Pled)
on the Grounds of Evidentiary Insufficiency**

The Court's rejection on the merits of Petitioner's challenge to the voluntariness of her

plea means that Petitioner *is* bound by the Section 2255 waiver in her plea agreement. This

branch of her application for section 2255 relief is therefore barred.

Further, independent of the reach of the plea agreement's Section 2255 waiver, this claim

would be barred by the force of Petitioner's guilty plea itself. The controlling jurisprudence, as

Judge Spatt recently summarized, is clear:

> Generally, a guilty plea "conclusively resolves the question of factual guilt to
> support the conviction, thereby rendering any antecedent constitutional violation
> bearing on factual guilt a non-issue." *United States v. Gregg*, 463 F.3d 160, 164
> (2d Cir. 2006). Therefore, if a petitioner has validly admitted guilt, "he may not
> thereafter raise independent claims relating to the deprivation of constitutional
> rights that occurred prior to the entry of the guilty plea." *Tollett v. Henderson*, 411
> U.S. 258, 267 (1973). Accordingly "'[t]he only proper focus of a federal habeas
> inquiry in such a situation is the voluntary and intelligent character of the guilty
> plea.'" *Amparo v. Henderson*, 1989 WL 126831, at *2 (E.D.N.Y. Oct. 18, 1989)
> (quoting *Isaraphanich v. United States*, 632 F. Supp. 1531, 1533 (S.D.N.Y.
> 1986)).

LaMarco, 336 F. Supp. 3d at 166 (all quotations and citations in original). Petitioner's knowing

and voluntary admission of guilt therefore bars her claim that counsel was ineffective for failing

to move to dismiss Count IV.

Finally, even if the claim were cognizable here, it would fail to present a basis for habeas

relief because criminal indictments valid on their face cannot be challenged on *evidentiary*

grounds. See, e.g., United States v. Tanner, 2018 WL1737235, at *6 (S.D.N.Y. Feb. 23, 2018)

("It is axiomatic that, in a criminal case, a defendant may not challenge a facially valid

indictment prior to trial for insufficient evidence") (internal quotation and citation omitted)

(collecting cases). Thus, Stafford's failure to make such a motion was not deficient performance and did not prejudice Petitioner within the meaning of Strickland. See, e.g. Sanchez v. United States, 2005 WL 1005159, at *3 (S.D.N.Y. Apr. 30, 2005) (counsel's "failure to assert a baseless claim does not fall below an objective standard of reasonableness nor prejudice the defendant").

Embedded in Petitioner's discussion of this claim in her reply papers is a separate claim charging Stafford with failing to move for production of *Brady* material. ECF Doc. 258 at 27-30. She asserts that Stafford should have acquired from Petitioner's mother an affidavit reflecting the prosecutors' and/or the agents' remarks, made to her mother, that Petitioner was a victim of Baslan. Such an affidavit, according to Petitioner is "exculpatory evidence . . . that could have cast doubt on the validity of [her] written statement." Id. at 28. Petitioner, however, misapprehends the applicable principles. Independent of any arguably exculpatory or guilt-mitigating value of the law enforcers' comment, *the prosecutors, by saying it, necessarily did not withhold* it, so there was no *Brady* violation. See Brady v. Maryland, 373 U.S. 83, 87 (1963) (holding "that the *suppression by the prosecution* of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution") (emphasis added); United States v. Bagley, 473 U.S. 667, 682 (1985) (evidence is material under *Brady* "if there is a reasonable probability that, *had the evidence been disclosed to the defense,* the result of the proceeding would have been different") (emphasis added). In any event, returning to the relevant ineffectiveness inquiry, there was no deficient performance or prejudice with respect to Stafford's handling of this unfortunate feature of the case: as discussed throughout this memorandum, Stafford consistently showcased, and the Court was acutely aware of, the ill-fated

31

role of Baslan in Petitioner's turn to criminality.

### Ground Four: Alleged Failure to Adequately Marshal
### Evidence of Government Misconduct at Suppression Hearing

As with Ground Three, because the Court has rejected Petitioner's voluntariness

challenge to her plea, this claim is now barred by the waiver in Petitioner's plea agreement.

Likewise, irrespective of the reach of the Section 2255 waiver, the claim is barred by Petitioner's

knowing and voluntary admission of her guilt.

In any event, the claim is frivolous. Stafford did not perform deficiently; to the contrary,

she moved to suppress Petitioner's post-arrest statements as coerced, included an affidavit

detailing Petitioner's version of the relevant events, secured an evidentiary hearing on the

motion, and thoroughly cross-examined the government's witness in furtherance of Petitioner's

theory. Petitioner also suffered no conceivable prejudice: as the Court's findings on the motion

(detailed above) show, the Court was keenly aware of all the relevant circumstances, including

the fact that Petitioner was quite upset when she made her statements. Nothing in her

submissions here suggests a basis for the Court to have veered from the conclusion announced at

the close of the hearing, *i.e.*, that Petitioner made her statements knowingly, voluntarily and with

full presence of mind.

### Ground Five: Alleged Inadequate Handling of
### Petitioner's Objections to the PSR

Even if this claim survives the Section 2255 waiver in Petitioner's plea agreement, it is

wholly without merit. For a claim of ineffective assistance of counsel relating to sentencing,

prejudice for Strickland purposes is "a reasonable probability that, but for counsel's substandard

performance, [the defendant] would have received a less severe sentence." United States v.

32

Lewis, 523 F. App'x 814, 819 (2d Cir. 2013). In the face of an advisory guidelines range of 262 to 327 months, Petitioner received the lowest sentence allowed by law, the ten-year mandatory minimum. She therefore cannot show any prejudice relating to Stafford's handling of her sentencing concerns, which disposes of her ineffectiveness claim without further discussion. See Strickland, 466 U.S. at 697 (explaining that habeas courts need not address both prongs of Strickland inquiry if defendant makes insufficient showing on one, and stating that, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

## CONCLUSION

For the reasons discussed, Defendant-Petitioner Kristen Henry's application for relief under 28 U.S.C. § 2255 is denied in its entirety. Because she has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability will not issue.

SO ORDERED.

Dated: Brooklyn, New York
     January /8 2019

                              s/ Raymond J. Dearie

                              RAYMOND J. DEARIE
                              United States District Judge